CHAMBERLAIN v. MARSHALL and others.*

(Circuit Court, N. D. Ohio, W. D.  August, 1881.)

1. EQUITY—BILL QUIA TIMET—REQUISITES OF.

In order to maintain a bill quia timet, the complainant must have a clear legal and equitable title connected with possession, and the pretended title or right which is alleged to be a cloud upon his title must not only be clearly invalid or inequitable, but must be such as may, either now or in the future, embarrass the real owner in controverting it.

2. VIRGINIA MILITARY DISTRICT IN OHIO—TITLES TO LANDS IN—EQUITY PRACTICE IN U. S. COURTS—BILL TO QUIET TITLE—REMEDY AT LAW—ACTION UNDER SECTION 5779, OHIO REV. ST.

On March 17, 1807, M. entered 100 acres of land in the Virginia military district in Ohio, under a Virginia military warrant, which was surveyed, and, on November 28, 1823, and April 6, 1824, the entry and survey were recorded in the surveyor's office of the district. In July, 1877, the entry and survey were returned to the land-office and a patent issued thereon to M.'s heirs. In 1842 these lands, standing in the name of M., became delinquent for taxes and were sold to A., to whom a tax deed was executed and through whom the complainant claims title. His predecessors in title entered into actual possession in 1849, since which time their and his possession has been under color of title, adverse, notorious, and uninterrupted.

It seems (1) that the entry and survey not having been returned to the land-office until after January 1, 1852, that they were vacated and annulled; (2) that the patent to M.'s heirs was issued without authority of law, and is void; (3) that the legal title is still vested in the United States; (4) that the tax title, being dependent upon the entry and survey of M., falls with them, and that the complainant has only a naked legal possession.

(See opinion of Mr. Justice Matthews in Fussell v. Hughes, supra.)

Held, (1) that a bill quia timet, as known in the chancery practice, cannot be maintained; (2) that, although section 5779, Rev. St. of Ohio, may authorize the complainant to commence an action for the determination of the adverse interest of the defendant, the complainant has a complete and adequate remedy at law, and cannot maintain a suit in equity in the courts of the United States to determine such interest.

In Equity.

William Lawrence, for complainant.

Jeremiah Hall, for defendants.

MATTHEWS, Justice.  This is a bill in equity to establish and quiet the title of the complainant to a tract of land of 100 acres in Logan county, Ohio, described as Virginia military entry and survey No. 5275. The complainant is a citizen of Ohio; the defendant, of Virginia.

The facts of the case, so far as material, are as follows:

On March 17, 1807, Robert Marshall, the ancestor of the defendants, entered a Virginia military warrant, No. 1763, for 100 acres, being entry No. 5275, which was surveyed, and the entry and survey recorded in the surveyor's office

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

of the Virginia military district, at Chillicothe, Ohio, on November 28, 1823, and April 6, 1824.

This entry and survey were for the first time returned to the land-office in July, 1877, and a patent was issued in July, 1877, and January 25, 1878, in the name of the United States, duly signed by the president and countersigned by the recorder of the general land-office, granting the tract described to the defendants, as only heirs at law of Robert Marshall, deceased, who is recited therein to have been the assignee of Robert Alvery, who was assignee of Francis Turner, the soldier whose service in the Virginia line, on continental establishment, is declared to be the consideration of the grant, and the grant therein made purports to be in pursuance of the act of congress of August 10, 1790, and other acts of congress amendatory thereto. The act aforesaid is entitled "An act to enable the officers and soldiers of the Virginia line, on continental establishment, to obtain titles to certain lands lying north-west of the river Ohio, between the Little Miami and Scioto."

It appears, from the records of the office of the auditor of Logan county, that in the list of lands in that county returned delinquent by the treasurer of the county for taxes for the year 1841, with the interest and penalty thereon, including the simple tax for the year 1842, there is the following:

| Proprietors Names. | Origl. Qn'ty. | No. of Entry. | Water-course. | Org'l Proprietor. | Acres Listed. |
|---|---|---|---|---|---|
| Marshall, Robert | 100 | 5275 | Derby | Robert Marshall | 100 |

TOTAL AMOUNT OF TAX.

| Value, including Buildings. | Township. | D. C. M. |
|---|---|---|
| 189 | Perry | 8 37 5 |
| | | 2 94 7, cost of survey included. |

And notice was thereby given that the tracts in said list, or so much thereof as necessary, would be sold at the court-house in said county on the last Monday in December (26th) by the treasurer. It further appears by the same records, under date of February 27, 1843, that on December 26, 1842, the county treasurer had sold the tract as above described to Jeremiah Asher, the said delinquent sale having been advertised according to law for four weeks in succession in the Logan Gazette, a newspaper published and printed in the town of Bellefontaine, in said county.

On May 20, 1845, the auditor of Logan county executed and delivered a deed, which was duly recorded, conveying to Jeremiah Asher the tract so sold, described as 100¼ acres of land and number of entry 5275, that was charged for taxation to Robert Marshall's name, and situated in Perry township. This deed recites that the treasurer of said county, on the last Monday in December, (26th,) in the year 1842, did sell, according to the provisions of the statute in that case made and provided, to Jeremiah Asher, the said tract of land for the taxes, interest, and penalty charged thereon, amounting to $8.37 5, which were paid by the purchaser, and that more than two years had elapsed from the time of said sale and the tract so sold had not been redeemed, and that the certificate of sale had been produced to him.

On August 6, 1849, Jeremiah Asher sold and conveyed the tract to Eliza Ann Chamberlain, wife of William Chamberlain, by a deed duly executed and recorded.

In the fall of 1849 the grantees entered into actual possession of the tract, enclosed it, cleared it in part, built a dwelling upon it, cultivated, and otherwise improved it. This possession has ever since been kept up by their successors in the title, the present complainant deriving title by several mesne conveyances from them. Since the fall of 1849 the possession of the complainant has been, with that of his predecessors, under color of title, adverse, open, notorious, and uninterrupted. Prior to that time the tract was in forest and not reduced to any actual occupancy.

On November 20, 1879, the defendants in this suit commenced in this court their action at law against the complainant to recover possession of the land in controversy.

The object and prayer of the bill in this suit is that the patent be cancelled, and perpetually to enjoin the prosecution by the defendants of their action at law; that they be required to release and convey all claim to the land to the complainant, and to establish and quiet the title and possession of the complainant.

The claim of the complainant is that he is in possession of the land, with a complete and perfect equitable title as against the defendants, which he has a right to have established and quieted by the process of this court.

This claim is based on three grounds:

(1) That the patent of January 25, 1878, is void, there being at that time no law in force authorizing its issue, and that consequently the naked legal title is outstanding in the United States; (2) that the tax title under which the complainant, and those through and from whom he derived title, claim, if not shown by the proof to be sufficient and valid, will, after long-continued adverse possession, under such circumstances as are shown in proof, be presumed to be good; (3) that a similar presumption will arise that the original equity of Robert Marshall, under his entry and survey, to a patent, was transferred and conveyed to the complainant, or those under and through whom he derives title.

It is obvious that this bill cannot be supported as a bill *quia timet*, as known to the equity jurisprudence of chancery courts. In describing the grounds of that jurisdiction, the supreme court of the United States, in the case of *Phelps* v. *Harris*, 101 U. S. 376, say:

"The questions, what constitutes such a cloud upon the title, and what character of title the complainant himself must have in order to authorize a court of equity to assume jurisdiction of the case, are to be decided upon principles which have long been established in those courts. Prominent among these are—*First*, that the title or right of the complainant must be clear; and, *secondly*, that the pretended title or right, which is alleged to be a cloud upon it, must not only be clearly invalid or inequitable, but must be such as may, either at the present or at a future time, embarrass the real owner in controverting it. For it is held that when the complainant himself has no title, or a doubtful title, he cannot have this relief." "Those only," said Mr. Justice Grier, "who have a clear, legal, and equitable title to land, connected with possession, have any right to claim the interference of a court of equity to give them peace, or dissipate a cloud in their title."

*Orton* v. *Smith*, 18 How. 265; and see *Ward* v. *Chamberlain*, 2

Black, 430, 444; *West* v. *Schnebly,* 54 Ill. 523; *Huntingdon* v. *Allen,* 44 Miss. 654; *Stark* v. *Starrs,* 6 Wall. 402.

And as to the defendant's title, if its validity is merely doubtful, it is more than a cloud, and he is entitled to have it tried by an action at law; and if it is invalid on its face, so that it can never be successfully maintained, it does not amount to a cloud, but may always be repelled by an action at law. *Overing* v. *Foote,* 43 N. Y. 290; *Meloy* v. *Dougherty,* 16 Wis 269.

Justice Story says:

" When the illegality of the agreement, deed, or other instrument appears upon the face of it, so that its nullity can admit of no doubt, the same reason for the interference of courts of equity to direct it to be cancelled or delivered up would not seem to apply, for, in such a case, there can be no danger that the lapse of time may deprive the party of his full means of defence; nor can it, in a just sense, be said that such a paper can throw a cloud over his right or title, or diminish its security; nor is it capable of being used as a means of vexatious litigation or serious injury." 2 Eq. Jur. § 700*a.*

And the supreme court in that case cites with approbation from the opinion of the supreme court of Mississippi, in a case between the same parties, (*Phelps* v. *Harris,* 51 Miss. 789,) as follows:

" This jurisdiction of equity cannot properly be invoked to adjudicate upon the conflicting titles of parties to real estate. That would be to draw into a court of equity from the courts of law the trial of ejectments. * * * The proper forum to try titles to land is a court of law, and this jurisdiction cannot be withdrawn at pleasure and transferred to a court of equity under the pretence of removing clouds from title."

In the present case, it appears from the bill itself that the complainant has not the legal title. The allegation is that the patent purporting to have been obtained by the defendant from the United States is void on its face, and *ab initio,* for want of authority on the part of the executive officers who have signed and issued it, and by virtue of a positive prohibition of an act of congress. If so, it necessarily results that the legal title to the land in controversy never passed from the United States, and is still vested in it. It also and with equal certainty results that there is no equitable estate in the land subsisting either in the defendant or the complainant; for the legislative declaration which makes the patent void, is based upon a prohibition which takes away from the entry and survey upon which the patent professes to be based all legal effect, and restores the land to the public lands of the United States precisely as if no entry, survey, or patent had ever been made or issued. There is nothing left,

therefore, to the complainant but a naked possession, which, as against the true owner, confers no right or title whatever, because time does not run against the sovereign; and to the defendant, a void patent of no legal significance or weight whatever. The claims of the complainant under his tax deed, and based on the presumption of a grant from the defendant of his equitable interest under the entry and survey, of course, cannot survive the extinguishment of the defendant's interest, both in equity and law. Those claims of the complainant are derived from and through the previous title of the defendant, and, being dependent upon it, must fall with it. The proposition, therefore, which sweeps away all title from the defendant, precisely as if none ever existed, as this proposition which avoids the patent does, necessarily leaves nothing in the complainant but a naked possession, which, however good it may be as a defence against any stranger without title, does not confer even the color of right as against the true owner.

It is true that the bill claims that an equitable title vested in Robert Marshall by virtue of the entry and survey, that that equitable estate passed to and vested in the complainant by virtue of the tax deed and the presumed grant thereof, and that only the patent is void. But a statement of the grounds on which it is claimed, and on which alone it can be claimed, that the patent is void, will show the impossibility of maintaining the existence of any such equitable estate to vest in the complainant.

By the act of March 23, 1804, entitled "An act to ascertain the boundary of the lands reserved by the state of Virginia, north-west of the river Ohio, for the satisfaction of her officers and soldiers on continental establishment, and to limit the period for locating the said lands," (2 St. at Large ——,) in the second section thereof, it is enacted that all the officers and soldiers, or their legal representatives, who are entitled to bounty lands within the above-mentioned reserved territory, shall complete their locations within three years after the passage of this act, and every such officer and soldier, or his legal representatives, whose bounty land has or shall have been located within that part of the said territory to which the Indian title has been extinguished, shall make return of his or their surveys to the secretary of the department of war within five years after the passing of this act, and shall also exhibit and file with the said secretary, and within the same time, the original warrant or warrants under which he claims, or a certified copy thereof, under the seal of the office where the said warrants are legally kept; which warrant or certified copy thereof,

shall be sufficient evidence that the grantee therein named, or the person under whom such grantee claims, was originally entitled to such bounty land; and every person entitled to said lands, and *thus applying*, shall thereupon be entitled to receive a patent in the manner prescribed by law.

The third section of the act is as follows:

"That such part of the above-mentioned territory as shall not have been located, and those tracts of land within that part of the said territory to which the Indian title has been extinguished, the surveys whereof shall not have been returned to the Secretary of War within the time and times prescribed by this act, shall thenceforth be released from any claim or claims for such bounty lands, and shall be disposed of in conformity with the provisions of the act entitled 'An act in addition to and modification of the propositions contained in the act entitled An act to enable the people of the eastern division of the territory north-west of the river Ohio to form a constitution and state government, and for the admission of such state into the Union on an equal footing with the original states, and for other purposes.' "

By these provisions of law it will be perceived that to entitle any one to a patent for lands in the Virginia military reservation, as bounties for military services, it was necessary to locate them by an entry within three years after the passage of the act; and where, as in this case, the location had been made within that part of the territory to which the Indian title had been extinguished, to make return of the survey to the proper department within five years from the passage of the act, and also, within the same time, make return of the original or a certified copy of the original warrant; and it was only persons entitled to said land, and *thus applying*, who were entitled to receive a patent.

This implied prohibition against the issue of a patent for such lands to any other persons and under any other circumstances, is reinforced by the additional and unambiguous provisions of the third section. By the terms of that section, all the lands within the reserved territory that shall not have been located, and those tracts to which the Indian title has been extinguished, the surveys whereof shall not have been returned within the time and times prescribed by the act, are thereby and thenceforth released from all claims for such bounty lands, and lapse to the United States as part of the public domain, free from that trust created by the grant from the state of Virginia, to be disposed of as otherwise required by law. Any patent, therefore, issued for any such, and based solely on the subsisting validity of the original entry and survey, not so returned within the limited time, is a patent issued by the officers of the

government, not only without authority of law, but in express violation of law and against its positive provisions, and. is consequently null and void, and passes no title whatever.

It is further claimed that the times limited by the second section of the act of 1804 for making locations and returns of survey have been, by several successive acts of congress, renewed and extended. By the act of July 7, 1838, (5 St. at Large, 262,) the time was extended to August 10, 1840. That act provides that—

"All entries and surveys which may have heretofore been made within the said reservation, in satisfaction of any such warrants, on lands not previously entered or surveyed, or on lands not prohibitad from entry and survey, shall be held good and valid, any omission *heretofore to extend the time for the making of such entries and surveys to the contrary notwithstanding.*"

This act of 1838 was revived and continued in force on August 19, 1841, (5 St. at Large, 449,) until January 1, 1844; in 1846, (9 St. at Large, 41,) until January 1, 1848; on July 5, 1848, (9 St. at Large, 245,) until January 1, 1850; and on February 20, 1850, (9 St. at Large, 420,) until January 1, 1852. This is the last act by which the time was extended or authority given for making locations of Virginia military warrants on any lands within the reservation. The act of March 3, 1855, (10 St. at Large, 701,) granted a further time of two years, after the passage of that act, within which it should be lawful to make and return surveys and warrants, or certified copies of warrants, to the general land-office, *of lands which had, prior to January 1, 1852, been entered within the Virginia military district;* but this act does not affect lands which had been *both entered and surveyed* prior to January 1, 1852. And the most recent enactment on the subject, the act of May 27, 1880, provides (section 2,) that "all legal surveys returned to the land-office on or before March 3, 1857, on entries made on or before January 1, 1852, and founded on unsatisfied Virginia military continental warrants, are hereby declared valid." The result is that all lands in the Virginia military district, entered and surveyed prior to January 1, 1852, of which, however, at that date, the surveys and warrants, or copies thereof, had not been returned to the general land-office, were, and have ever since continued to be, released from all claim by virtue of such entry, surveys, and warrants; and that any patent issued therefor, purporting to be, in pursuance of such extinguished claim, is without authority of law, in violation of its express provisions, and null and void. Such, at least, is the nature and necessary extent of the claim of the complainant, and this review of the legislation on the subject on which that claim is based, has been made

not so much for the purpose of a decision as to its effect upon the validity of the defendant's patent, as to show, as it clearly does, that, if that effect is what the complainant claims, then it also takes from the complainant any right to insist that he has acquired and is now invested with any estate in the lands by virtue of his tax deed, or any grant, actual or presumed, from the defendant, of his rights under the entry and survey. All such rights, on both parts, have equally come to naught by the same supposition.

There is, therefore, no ground in equity for maintaining the present bill as a bill to quiet the complainant's title. It is argued, however, that this bill may be maintained upon the provisions of section 5779 of the Revised Statutes of Ohio. It reads as follows:

"An action may be brought by a person in possession by himself or tenant of real property, against any person who claims an estate therein adverse to him, for the purpose of determining such adverse estate or interest."

Prior to the adoption of this provision in the Code of Civil Precedure in this state, and under the provisions of a statute regulating the practice in chancery, it was held by the supreme court of Ohio that to maintain a bill *quia timet* it was necessary that the complainant should have both the legal title and the actual possession of the real estate, (*Douglas* v. *Scott*, 5 Ohio, 196; *Clark* v. *Hubbard*, 8 Ohio, 385; *Thomas* v. *White*, 2 Ohio St. 540;) although in *Buchanan* v. *Roy's Lessee*, 2 Ohio St. 267, it was held that it might be maintained if the complainant had acquired a valid title merely by the length of his possession.

In the case of *Ellisthorpe* v. *Buck*, 17 Ohio St. 72, which arose upon the provision now in force, a bill was filed to establish a disputed boundary, and the objection was made that the defendant had been denied the right to a trial by jury. The objection was overruled on the ground that the plaintiff could not have obtained the relief sought by an action for the recovery of real property, and that the remedy provided by this provision, so far as applied to that case, was in harmony with the more ancient rules of equity jurisprudence, which gave relief, where the recovery of possession is not asked, in cases where the controversy arises out of a confusion of boundaries.

In *Collins* v. *Collins*, 19 Ohio St. 470, the court, speaking by *Welch*, J., said:

"As a general rule the bill of peace could not be maintained unless the plaintiff had first established his right at law. One exception to this general rule was where the parties were so numerous, or set up their several claims in such form, as to render a trial of the right at law impracticable. Another

exception contended for, but generally disallowed by the chancellor, was where the plaintiff was in possession and the defendant failed to bring any action; the plaintiff having, therefore, no opportunity to establish his right at law. As I understand the decision of this court in *Douglas* v. *McCoy*, 5 Ohio, 522, it was to supply this precise omission that our several statutory provisions on the subject were enacted. These provisions are found in the acts of 1810, 1824, and 1831, (Chase's St. 687, 1278, and 1697,) substantially as in the 557th section of the Code, with the difference that by the latter *possession alone*, instead of legal title and possession, is declared to be a sufficient basis for the action. The only effect of this provision in the Code is to substitute the plaintiff's possession for the establishment of his right by trials at law. In all other essentials the remedy by bill of peace remains the same as under the old practice."

In the most recent case in the Ohio Reports on the question (*Rhea* v. *Dick*, 34 Ohio St. 420) it was decided that under an amendment which affected the original section, a person in possession might compel a litigation as to his title with an adversary claiming only an estate in remainder or reversion, or contingent upon a future event, and not adverse to the plaintiff's right to *present possession*. And the court quotes with approval from the opinion of the supreme court of California in the case of *Joyce* v. *McAvoy*, 31 Cal. 274, in construing a similar statute of that state, as follows:

"The statute giving this right of action to the party in possession does not confine the remedy to the case of an adverse claimant setting up a legal title, or even an equitable title; but the act intended to embrace every description of claim whereby the plaintiff might be deprived of the property, or its title clouded, or its value depreciated, or whereby the plaintiff might be incommoded or damnified by the assertion of an outstanding title already held or to grow out of adverse pretension. The plaintiff has the right to be quieted in his title whenever any claim is made to real estate of which he is in possession, the effect of which claim might be litigation, or a loss to him of the property."

In the same case from which this citation is taken (*Rhea* v. *Dick*) the supreme court of Ohio add as follows:

"Cases may arise under our statute in which the parties may have a constitutional right to have the issues of fact tried by a jury. Should such cases arise, the court is competent to authorize such trial, either in the case, or by requiring a separate action to be brought for the purpose before the rendition of the final decree."

The case of *Stark* v. *Starrs*, 6 Wall. 402, was a suit in equity, begun in the state courts of Oregon, upon a similar statute, providing that "any person in possession of real property may maintain a suit in equity against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or

interest." In commenting on and construing that enactment, Mr. Justice Field said:

"This statute confers a jurisdiction beyond that ordinarily exercised by courts of equity, to afford relief in the quieting of title and possession of real property. By the ordinary jurisdiction of those courts a suit would not lie for that purpose unless the possession of the plaintiff had been previously disturbed by legal proceedings on the part of the defendant, and the right of the plaintiff had been sustained by successive judgments in his favor. *Shepley* v. *Rangely*, Davies, 242; *Droonshe* v. *Newenham*, 2 Sch. & Lef. 208; *Curtis* v. *Sutter*, 15 Cal. 257. * * * By the statute in question it is unnecessary, in order to obtain this interposition of equity, for the party in possession to delay his suit until his possession has been disturbed by legal proceedings, and judgment in these proceedings has passed in his favor. It is sufficient that a party out of possession claims an estate or interest in the property adverse to him. He can then at once commence his suit and require the nature and character of such adverse estate or interest to be set forth and subjected to judicial investigation and determination, and that the right of possession, as between him and the claimant, shall be forever quieted. We do not, however, understand that the mere naked possession of the plaintiff is sufficient to authorize him to institute the suit, and require an exhibition of the estate of the adverse claimant, though the language of the statute is that 'any person in possession by himself or tenant may maintain' the suit. His possession must be accompanied with a claim of right,—that is, must be founded upon title, legal or equitable,—and such claim or title must be exhibited by the proofs, and perhaps in the pleadings also, before the adverse claimant can be required to produce the evidence upon which he rests his claim of an adverse estate or interest."

In that case the plaintiff's title consisted of a patent purporting to have been granted by the United States. From a consideration of the laws in force applicable to the case, the court determined that the patent was void, as having been issued without authority of law. Mr. Justice Field then proceeds as follows:

"His position (the plaintiff's) is, therefore, reduced to that of a mere possessor without title. Such possession is entirely insufficient to justify the interposition of equity for the determination of the defendant's title, even under the very liberal act of Oregon. The plaintiff must first show in himself some right, legal or equitable, in the premises before he can call in question the validity of the title of the defendant."

The complainant in this case, we have already seen, is in a similar category. His denial of the validity of the defendant's claim of title takes from himself all title which otherwise he might claim, except that based upon mere naked possession.

The remedy given by the section of the Revised Statutes of Ohio under present consideration is "an action," meaning the universal

civil action of that code which has taken the place of all common law actions and the suit by bill in chancery. At the same time, the distinction in the substance of common law and equitable rights is still maintained. In *Dixon* v. *Caldwell*, 15 Ohio St. 413, it is said:

"The distinction between legal and equitable rights exists in the subjects to which they relate, and is not affected by the form or mode of procedure that may be prescribed for their enforcement. The Code abolished the distinction between actions at law and suits in equity, and substituted in their place one form of action; yet the rights and liabilities of parties, as distinguished from the mode of procedure, remain the same since, as before, the adoption of the Code."

To the same effect is *Chinn* v. *Trustees, etc.*, 32 Ohio St. 236. In *Hager* v. *Reed*, 11 Ohio St. 635, the court held that the action of the Code will be regarded and treated as a civil action at law or a civil action in chancery, according as the facts alleged and the relief proper shall determine.

While, therefore, there may be no reason why the remedies, although new, given by this statute may not be enforced in the courts of the United States, there still remains, in each case, the question whether it shall be by action at law or suit in equity; for in these courts the formal distinction in procedure is maintained. Indeed, there are fundamental constitutional reasons which require that common-law rights of action shall not be transferred to the jurisdiction of chancery process. While it may be true, therefore, that section 5779 of the Revised Statutes of Ohio would authorize the complainant, under the circumstances shown in this case, to commence an action for the purpose of determining the adverse estate or interest in the land in controversy claimed by the defendant, the question whether that action shall be by bill in chancery on the equity side of the court, must depend on the other question, whether he has or has not a complete and adequate remedy at law. If the rights in controversy are legal rights as distinguished from equitable, and if there are no considerations of an equitable nature applicable to the case, and which it is necessary to apply in order to prevent a failure of justice, then the conclusion seems to be required that the remedy must be sought by an action at law, and not by a suit in equity.

In the present case there seems to be no necessity for a resort to equity, and no special considerations to justify it. The defendant had already brought his action at law to try the very matters the complainant seeks to put in issue in this suit; so that there was no

danger of injury to the plaintiff, in apprehended loss of evidence or otherwise, from any unreasonable or unconscientious delay on the part of the defendant. The questions to be decided are questions of law, and every consideration urged, or that can be urged, in this form of proceedings, will be equally available in the defence of the pending action at law.

If by reason of the acts of congress which have been cited, and the facts admitted in respect to the entry and survey of Robert Marshall, the patent issued to his heir at law in 1878 is null and void, as claimed, then that patent, on which alone the defendant's title at law rests, will be of no avail as a ground for the recovery of the possession of the land in the action brought for that purpose. In *Simmons* v. *Wagner,* 101 U. S. 260, the supreme court of the United States decided that a patent issued without authority of law was void, and could not be used as evidence in ejectment, even against one in possession without title. The chief justice said in that case:

"The sale to Mecke and patent thereon to Simmons, more than 30 years afterwards, were null and void, and conveyed no title as against Russell and his assigns. *It is of no consequence whether the assignees of Russell could get a patent in their own names or not.* After the certificate issued the lands were no longer a part of the public domain, and the authority of the officers of the government to grant them, otherwise than to him or some person holding his rights, was gone. *The question is not whether Wagner, if he was out of possession, could recover in ejectment upon the certificate, but whether Simmons can recover as against him. He is in a situation to avail himself of the weakness of the title of his adversary, and need not assert his own.*"

*In Polk's Lessee* v. *Wendell,* 9 Cranch, 99, Chief Justice Marshall said:

"But there are cases in which a grant is absolutely void: as when the state has a title to the things granted; *or where the officers had no authority to issue the grant.* In such cases the validity of the grant is necessarily examinable at law."

This doctrine was reaffirmed in the case between the same parties in 5 Wheat. 303.

The decision in *Hoofnagle* v. *Anderson,* 7 Wheat. 212, is not inconsistent with this doctrine; for in that case the patent was not void for want of power to issue it, but voidable only for irregularities in the exercise of the power.

In *Ladiga* v. *Roland,* 2 How. 590, the court said:

"The president could give no such power, or authorize the officers of the land-office to issue patents on such sales; they are as void as the sales, by reason of their collision with the treaty."

In *U. S.* v. *Stone*, 2 Wall. 535, Mr. Justice Grier said:

"Patents are sometimes issued unadvisedly or by mistake, when the officer has no authority in law to grant them, or when another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority."

On the other hand, if the patent is valid at law, but voidable in equity, it must be by reason of some superior equity on the part of the complainant that entitles him to charge it with a trust in his favor, or to restrain the defendant from an inequitable use of it, to his injury; but the complainant asserts none such now in this proceeding, and insists on treating it as utterly without any legal force whatever. If the complainant should admit that the effect of the patent was to put the legal title in the defendant, and allege equitable grounds whereby it would enure to his benefit, or grounds on which it should be cancelled as having been obtained in fraud of his equitable rights, there would be place for the exercise of equitable jurisdiction; but the controversy as he makes it, on the bill and proof, is a contest between adverse claims of a purely legal nature. Such a controversy is only to be settled in a court of law, according to the principles and methods and under the guaranties of the common law.

It follows that the bill must be dismissed; but, of course, without prejudice to the rights of either capable of being enforced in the pending action at law, and also without prejudice to the complainant's right to file a bill in equity hereafter, in the event it should be decided in the action at law that the defendant's patent is valid to pass to him the legal title, to charge him as trustee, and compel a conveyance on any equitable ground the complainant may be able to establish.

See *Fussell* v. *Hughes, supra.*